# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CATHY SLATTERY, | Civil No. 09-252 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| rms COMPANY, | |
| Defendant. | |

Michael A. Fondungallah, **FONDUNGALLAH, KIGHAM & ESSIEN, LLC**, 2499 Rice Street, Suite 145, St. Paul, MN 55113, for plaintiff.

Joseph W. Hammell, and Marilyn J. Clark **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498, for defendants.

On February 4, 2009, plaintiff Cathy Slattery brought this action against her former employer, defendant rms Company ("RMS"), alleging claims under the Age Discrimination in Employment Act ("ADEA") and the Minnesota Human Rights Act ("MHRA"), and retaliation and interference claims under the Family Medical Leave Act ("FMLA"). The case is before the Court on defendant RMS' motion for summary judgment. For the reasons set forth below, the Court grants RMS' motion.

## BACKGROUND

RMS is a contract manufacturer with a focus on "high precision machining." (Jacobs Aff. ¶ 3, Docket No. 15.) RMS has two divisions: the Medical Device Division

and the Aerospace Connector Division.  (*Id.*)  The Medical Device Division produces medical device implants and surgical instruments, and the Aerospace Connector Division produces electrical connectors.  (*Id.*)  The electrical connectors are sold directly to aircraft systems manufacturers or to distributors, and the Boeing Company ("Boeing") is the Aerospace Connector Division's largest customer.  (*Id.*)

The Aerospace Connector Division is subdivided into three departments that focus on different aspects of the connector manufacturing process: molding, machining, and assembly.  (*Id.* ¶ 4.)  Employees in the connector assembly department are responsible for "finalizing connector parts, building electrical connectors, and preparing product for shipment."  (*Id.*)  According to John Jacobs, the Director of Operations for the Aerospace Connector Division, those "[assembly] tasks range from basic skills, which are relatively simple to learn and perform, to complex skills, which are more critical to the department's operations.  The latter involve detail-oriented work with more complex steps that require both precision and excellent hand-eye coordination."  (*Id.*)

## I.   SLATTERY'S EMPLOYMENT WITH RMS

In February 1996, RMS hired Slattery to work in the connector assembly department, where she remained throughout her employment.  (Pl.'s Compl. ¶ 15, Docket No. 1; Slattery Dep. Tr. at 12:7-9, 15-17, Clark Aff. Ex. T, Docket No. 14.)  During her eleven years with RMS, Slattery's primary work responsibility was packaging parts for shipment, a so-called basic skill.  (Slattery Dep. Tr. at 17:12 – 18:15, Clark Aff. Ex. T, Docket No. 14.)  Slattery's packaging duties included placing a dust cap on both ends of

a connector, typing parts information into a computer, placing the connector in a bag, pushing her foot on a pedal to seal the bag, and placing parts into shipping bags. (*Id.* at 17:12 – 18:10.) RMS gave Slattery generally positive performance reviews. (*See, e.g.*, Clark Aff. Ex. A, Docket No. 14 ("Your [sic] doing a good job learning the packaging area[.]"); *id.* Ex. G ("Keep up the nice job at packaging.").) Occasionally, the annual performance reviews suggested that Slattery needed assistance learning other areas of the connector assembly department. (*See, e.g.*, Clark Aff. Exs. B, G, K, Docket No. 14.) Slattery was not able to perform a broad range of "critical complex skills" in the connector assembly department. (Slattery Dep. Tr. at 50:10-21; 53:4-9, Clark Aff. Ex. T, Docket No. 14.)

In 2007, Jacobs implemented in the connector assembly department a "cross-training program . . . to help ensure adequate coverage in all job skill areas when employees are out due to illness, vacation, and so forth." (Jacobs Aff. ¶ 5, Docket No. 15.) The program is "not a formal training policy or process." (*Id.*) Instead, "it simply involves tracking the various skills on which each employee has been trained, and at what level of skill, on a cross-training chart as a way to visually identify whether the department has enough employees trained in each skill area to cover department needs." (*Id.*) RMS did not use a formal process to select employees for cross-training on various skills, but rather evaluated the department's needs and the employees' availability and proficiency in different tasks. (Hemmelgarn Dep. Tr. at 32:1-6, 40:14 – 42:2, 62:3 – 64:24, Clark Aff. Ex. S, Docket No. 14.) RMS gave Slattery the opportunity to train in

any skill area that she wished.[1]   (Slattery Dep. Tr. at 40:8 – 43:17, Clark Aff. Ex. T,

Docket No. 14.)

The cross-training chart lists the employees in the connector assembly department

and provides a visual depiction of the skills – sub-categorized as "Critical Complex

Skills" and "Basic Skills" – that those employees are capable of performing.  (Clark Aff.

Ex. N, Docket No. 14.)   The chart also includes a description of the employees'

proficiency in the applicable skills.  In ascending order, those proficiency categories are:

"Learning Basic Job Elements," "Can Perform Elements with Some Assistance," "Can

Perform Elements Without Assistance," "Fully Certified in Job Elements, Quality, TPM

& Safety," and "Mastered, Can Instruct Others."  (*Id.*)   According to the cross-training

chart, Slattery demonstrated some level of proficiency in the following skills:

**Critical Complex Skills:**
- Rubber Ink Stamping:          "Learning Basic Job Elements"

**Basic Skills:**
- 3-Line Stamping:              "Can Perform Elements with Some Assistance"
- Electrical testing:           "Can Perform Elements Without Assistance"
- Cut Springs (Spot Weld):      "Can Perform Elements Without Assistance"
- Contact Hood Assembly:        "Can Perform Elements Without Assistance"
- Building:                     "Fully Certified in Job Elements, Quality, TPM & Safety"
- O-Rings:                      "Fully Certified in Job Elements, Quality, TPM & Safety"
- Spin Overs:                   "Fully Certified in Job Elements, Quality, TPM & Safety"
- Load Clips/709 RTV:           "Fully Certified in Job Elements, Quality, TPM & Safety"
- Packaging:                    "Mastered, Can Instruct Others"

(*Id.*)

---

[1]   At her deposition, Slattery testified that she did not ask about the possibility of cross-training on jobs other than those suggested by her supervisors.  (Slattery Dep. Tr. at 43:10-13, Clark Aff. Ex. T, Docket No. 14.)  When asked if there "[w]ere any other jobs that [she] wanted to do the cross-training on" that she was not given the chance to do, she responded, "No, it was a nice variety."  (*Id.* at 43:14-17.)

As indicated in the cross-training chart, Slattery was only able to perform one "critical complex skill," rubber ink stamping, with any level of proficiency. (*Id.*) RMS produced evidence that Slattery could only perform that task if a co-worker assisted her by setting up the machine, which is an essential part of the task. (Hemmelgarn Dep. Tr. at 66:17 – 67:20, Clark Aff. Ex. S, Docket No. 14.) Slattery performed other basic-skill tasks with varying degrees of proficiency. According to RMS, Slattery frequently made errors when performing the "Load Clips/709 RTV" task, and as a result other employees had to exercise extreme care when reviewing her work in performing that task. (Dahl Aff. ¶ 4, Docket No. 17.) Slattery was not able to attain any level of proficiency in fifteen of the sixteen critical complex skills. (Clark Aff. Ex. N, Docket No. 14.) RMS attempted to train Slattery on critical complex skills like bonding and part marking, but Slattery did not demonstrate the hand-eye coordination necessary to complete those tasks. (Hemmelgarn Dep. Tr. at 32:9 – 33:21, Clark Aff. Ex. S, Docket No. 14; Redmon Aff. ¶ 3, Docket No. 19.) Further, Slattery often repeated the same mistakes when learning a new task and was unable to retain information from prior cross-training after she had moved on to a new task. (Ramnauth Aff. ¶¶ 4-6, Docket No. 16; Dahl Aff. ¶ 4, Docket No. 17; Redmon Aff. ¶ 3, Docket No. 19; Wever Aff. ¶ 3, Docket No. 18.) As a consequence, RMS considered Slattery to be the least skilled employee in the connector assembly department, and her main skill was packaging. (Hemmelgarn Dep. Tr. at 53:7-9, 59:1-12, Clark Aff. Ex. S, Docket No. 14; Osbakken Dep. Tr. at 54:9-19, Clark Aff. Ex. R, Docket No. 14.)

## II.    SLATTERY'S TERMINATION

RMS alleges that in the fall of 2007, Boeing reduced its orders for electrical connector products.  (Jacobs Aff. ¶ 6, Docket No. 15.)  As a result, RMS determined that it needed to reduce its work force and eliminate five positions.  (*Id.*)  Jacobs asked department supervisors for the Aerospace Connector Division departments "to determine which positions would be eliminated based on factors such as the skill sets of both employees and temporary workers and the business needs of the department based on projected sales levels."  (*Id.*)

Shelley Hemmelgarn, the supervisor of the connector assembly department, was responsible for identifying two positions to be eliminated from her department. (Hemmelgarn Dep. Tr. at 50:8-16, Clark Aff. Ex. S, Docket No. 14.)  Hemmelgarn testified that she based her decision "on what needed to be done, . . . what critical operations we had to keep going and how we could use our employees – move them around as needed."  (*Id.* at 50:18-21.)  Hemmelgarn decided to eliminate Slattery's position because Slattery was able to perform only basic tasks, and because her main responsibility was packaging.  (*Id.* at 53:7-16, 59:1-12, 70:24 – 71:11.; *see also id.* 53:7-9 ("Cathy was the full-time packager.  She could not do the other critical operations that I needed somebody there full time all the time to do.").)  On October 12, 2007, RMS terminated Slattery's employment.  (Mem. in Supp. of Mot. for Summ. J. at 20, Docket No. 13.)  When RMS informed Slattery that it was terminating her position, RMS told Slattery it was because she was "not flexible in connectors."  (Slattery Dep. Tr. at 44:20 – 45:4, Clark Aff. Ex. T, Docket No. 14.)

Hemmelgarn also eliminated a thirty-four-year-old employee's position because that individual lacked proficiency in critical complex skills.  (Hemmelgarn Dep. Tr. at 49:13-24, Clark Aff. Ex. S, Docket No. 14.)  After RMS terminated Slattery, no single individual had packaging as their primary duty, and the remaining employees shared duties for the packing tasks.  (*Id.* at 71:2-11; Def.'s Resp. to Pl.'s Interrogs. at 14-16, Clark Aff. Ex. P, Docket No. 14.)

In the wake of RMS lay-offs, RMS retained two younger temporary workers, Shelley Johnson and Mayra Mendoz.  (Jacobs Aff. ¶ 7, Docket No. 15.)  In May 2008, RMS offered Johnson and Mendoz permanent positions, although RMS did not hire either Johnson or Mendoz to perform exclusively packaging tasks.  (*Id.* ("[T]hey were retained because they possessed skills that matched the connector assembly department's business needs at that time.  Specifically, these individuals were able to perform critical complex skills that were valuable to the business operations of the department."); Hemmelgarn Dep. Tr. at 30:16-22, 36:5 – 38:10, Clark Aff. Ex. S, Docket No. 14.)  According to the cross-training chart, Johnson possessed the following proficiencies:

**Critical Complex Skills:**
- Bonding:                  "Mastered, Can Instruct Others"
- Printing:                 "Can Perform Elements Without Assistance"
- Plasma Clean Shells:      "Can Perform Elements Without Assistance"
- Bond Hard Sockets:        "Can Perform Elements Without Assistance"
- Retention testing:        "Can Perform Elements Without Assistance"

**Basic Skills:**
- Electrical Testing:       "Can Perform Elements Without Assistance"
- O-Rings:                  "Can Perform Elements Without Assistance"
- Contact Hood Assembly:    "Can Perform Elements Without Assistance"
- Building:                 "Can Perform Elements with Some Assistance"
- Load Clips 709/RTV:       "Can Perform Elements with Some Assistance"

(Clark Aff. Ex. N, Docket No. 14.)  Mendoz possessed the following proficiencies:

**Critical Complex Skills:**
- Part Marking:                          "Fully Certified in Job Elements, Quality, TPM & Safety"

**Basic Skills:**
- Electrical Testing :               "Fully Certified in Job Elements, Quality, TPM & Safety"
- Building:                             "Fully Certified in Job Elements, Quality, TPM & Safety"
- O-Rings:                            "Fully Certified in Job Elements, Quality, TPM & Safety"
- Spin Overs:                       "Fully Certified in Job Elements, Quality, TPM & Safety"
- 3-Line Stamping:                 "Fully Certified in Job Elements, Quality, TPM & Safety"
- Load Clips/709 RTV:          "Can Perform Elements Without Assistance"
- Ink Groove:                       "Can Perform Elements with Some Assistance"

(*Id.*)

## III.   SLATTERY'S FMLA LEAVE REQUEST

On July 16, 2007, two-and-a-half months before RMS eliminated her position, Slattery asked RMS for four days of leave to assist her mother in finding a nursing home. (Slattery Dep. Tr. at 20:10-25:16, Clark Aff. Ex. T, Docket No. 14.)  On those days, Slattery called her supervisors and informed them that she would not be reporting to work because she was looking for a nursing home for her mother.  (*Id.*)  RMS granted Slattery's request for leave.  (Hemmelgarn Dep. Tr. at 14:16-15:4, Clark Aff. Ex. S, Docket No. 14.)  When Slattery returned to work, she submitted a Department of Labor Certification Health Care Provider Form (the "Provider Form") documenting her mother's condition as a serious health condition under the FMLA.  (*Id.* at 15:22 – 18:13.) RMS entered Slattery's time off from July 16 to July 19, 2007, on company records as FMLA leave.  (*Id.*)  Slattery testified that on the fourth day of her FMLA leave, Slattery informed Hemmelgarn that she was still looking for a home for her mother.  (Slattery Dep. Tr. at 24:25 – 25:7, Clark Aff. Ex. T, Docket No. 14.)  Hemmelgarn responded, "do

what you have to do." (*Id.* at 25:7 – 26:3.)  Slattery testified that the "snotty" tone of Hemmelgarn's voice gave her the impression that she could not take any more leave. (*Id.* at 26:1 – 26:13.)

Prior to July 2007, RMS had approved Slattery's request for vacation time from August 13, 2007, to August 17, 2007.  Slattery did not take that time off to care for her mother, however, and Slattery conceded at her deposition that she did not request further time off after July 19 to assist her mother.  (Slattery Dep. Tr. at 28:3-11, 31:22 – 33:6, Clark Aff. Ex. T, Docket No. 14.)

On February 4, 2009, Slattery brought this action against RMS alleging that RMS discriminated against her because of her age in violation of the ADEA and the MHRA, and alleging interference and retaliation in violation of the FMLA.  (Compl., Docket No. 1.)  On February 1, 2010, RMS filed the instant motion for summary judgment. (Mot. for Summ. J., Docket No. 11.)

## DISCUSSION

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A court considering a motion for summary judgment must view the facts in the

light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    ADEA AND MHRA AGE DISCRIMINATION CLAIMS[2]

### A.    Disparate-Treatment Claims

The ADEA makes it unlawful for an employer to discriminate against any individual based on age, 29 U.S.C. § 623(a)(1), but the statute applies only to individuals who are at least 40 years old, *id.* § 631(a).  To establish an ADEA claim, Slattery "must show that her employer intentionally discriminated against her."  *Ziegler v. Beverly Enters.-Minn., Inc.*, 133 F.3d 671, 675 (8th Cir. 1998).

Because Slattery has not identified any direct evidence of age discrimination,[3] she must prove her disparate-treatment claims under the burden-shifting analysis established

---

[2] The Court evaluates claims under the ADEA and the MHRA under the same burden-shifting framework.  *See Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1338-39 (8th Cir. 1996).

[3] Slattery testified during her deposition:

Q: Did anyone at RMS ever say or do anything that made you believe that you were laid off because of your age?

A: I was the oldest one there.

Q: Okay.  Anything other than that?

A: No.

(Slattery Dep. Tr. at 50:17-22, Clark Aff. Ex. T, Docket No. 14.)  *See Ward v. Int'l Paper Co.*, 509 F.3d 457, 460 (8th Cir. 2007) ("Because there is no direct evidence of age discrimination in

(Footnote continued on next page.)

in *McDonnell Douglas Corp. v. Green*.   411 U.S. 792, 802-03 (1973).   Under that framework, an individual alleging age discrimination must first establish a *prima facie* case of discrimination.   *Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008).   If an individual does so, the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the termination.   *Id.*   If the employer comes forth with such evidence, the presumption of discrimination raised by the claimant's *prima facie* case no longer applies and the plaintiff must show by a preponderance of the evidence that the employer's reasons for termination were a pretext for intentional discrimination.   *Id.*   The Supreme Court has emphasized that a plaintiff asserting an ADEA disparate-treatment claim must establish that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2357 (2009).

### 1.   *PRIMA FACIE* CASE OF AGE DISCRIMINATION

Slattery must first establish a *prima facie* case of discrimination by showing that (1) she was at least 40 years old or older at the time of her termination; (2) she was otherwise qualified for the position when RMS terminated her employment; (3) RMS terminated her; and (4) her termination occurred in circumstances giving rise to an inference of unlawful discrimination.   *Riley*, 518 F.3d at 1000; *see also Ward*, 509 F.3d at 460 (noting that under the fourth element of a *prima facie* discrimination claim, where

_____

(Footnote continued.)

this case, the *McDonnell Douglas* framework applies and [the plaintiff] must make a prima facie case.").

the alleged discrimination took place in the context of a reduction in force, a plaintiff must show that "there is some additional evidence that age was a factor in the employer[']s action"). "A plaintiff may meet the last requirement by presenting . . . 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees)." *Hanebrink v. Brown Shoe Co.*, 110 F.3d 644, 646 (8th Cir. 1997).

There is no dispute regarding the first three elements. RMS contends, however, that Slattery has failed to come forth with evidence that her age was a factor in RMS' termination decision. Slattery responds that she has presented evidence giving rise to an inference of age discrimination by demonstrating that Hemmelgarn asked Slattery four to five times about retirement, that RMS' justification for firing Slattery was that she was "not flexible," and that RMS hired two younger employees to replace Slattery. The Court addresses each of Slattery's contentions in turn.

### a.    Hemmelgarn's Inquiries About Retirement

Occasional questions about retirement plans are insufficient to demonstrate age-based animus. *See, e.g.*, *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir. 1999); *Ziegler*, 133 F.3d at 676. There may be circumstances, however, where "retirement inquiries are so unnecessary and excessive – that is, unreasonable – as to constitute evidence of discriminatory harassment." *Cox v. Dubuque Bank & Trust Co.*, 163 F.3d 492, 497 (8th Cir. 1998).

Slattery alleges in her complaint that "[c]ommencing in May 2007 to October 2007, . . . Slattery's supervi[s]or, Shelley Hemmelgarn asked her at least five times when

she planned to retire and . . . Slattery would respond that she does not know and was not

planning on retiring."  (Compl. ¶ 19, Docket No. 1.)  Slattery's deposition testimony

differed from this allegation:

> Q: [D]o you recall having any discussions with anyone . . . about the subject of whether you had any plans to retire?
>
> A: Yes.
>
> Q: Okay.  Tell me what you recall about that, please.
>
> A: Well, Shelley would come up to me and just in conversation ask when I was going to retire.
>
> Q: Did that happen once?
>
> A: It happened four or five times during the course of my working at RMS . . . from '96 to '07.
>
> Q: So, over the span of 1996 to 2007, your recollection is that four or five times Shelley asked you something about retirement?
>
> A: Yes.
>
> Q: When was the first time?
>
> A: I was at electrical.
>
> Q: Okay.  What year was it?
>
> A: I can't remember.
>
> Q: Whatever this year was, do you think it could have been 1997, '98, '99, do you think?
>
> A: Possibly.
>
> Q: Okay.  Tell me what you recall Shelley saying to you and what you said to her.

A: Oh, it was just vague, you know.  She would, you know, come up and sa[y] when do you plan to retire. . . .

Q: You said that it happened maybe four or five times and Shelley would say something or other.  I'm just trying to find out, as best you can tell me, when these conversations happened and exactly what it was that somebody said?

A: I just, in my mind, it would be just a vague conversation.

Q: Okay.  And when you say it would be a vague conversation, that's why I'm pressing a little bit more.  Because if you don't remember the conversation, you can just tell me that, but if you do remember a conversation, I need to know in as much detail as possible what it was that you said and what it was that she said?

A: No, I can't remember in detail what the conversation was . . . . [I]t was just vague conversation and, you know, she would come up, well, when do you plan on retiring. . . .

Q: Okay. So let me summarize what I think I'm hearing, and tell me if I'm wrong, is that over the course of 1996 to 2007, you're saying that four or five times Shelley asked you something about retirement, but when it comes to trying to recall the specifics about when these conversations occurred or what it was specifically that Shelley said to you, those details are things that you don't recall today; is that fair?

A: Yes, I can't recall them, yes.

(Slattery Dep. Tr. at 33:7 – 36:22, Clark Aff. Ex. T, Docket No. 14.)

In opposition to RMS' motion for summary judgment, Slattery submitted an affidavit – which Slattery signed two days prior to filing her opposition brief – stating that "[s]tarting in May of 2007 to about October 2007, my supervi[s]or, Shelley Hemmelgarn asked me at least five times when I planned to retire and I responded each time that I do not know and was not planning on retiring."  (Slattery Aff. ¶ 7, Docket No. 31.)  Slattery's affidavit statement – which is nearly identical to the allegation in the

complaint – is inconsistent with Slattery's deposition testimony that Hemmelgarn asked her about retirement four to five times over the course of Slattery's eleven years of employment with RMS, and that Slattery could not recall when Hemmelgarn first asked her about retirement.   In light of this inconsistency, the Court declines to consider Slattery's contradictory affidavit for the purposes of determining if there is a material fact dispute.  *See Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831 (8th Cir. 2008) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits." (internal quotation marks omitted; alteration in original)).

Giving Slattery the benefit of all reasonable inferences, a reasonable trier of fact could not conclude, based on Hemmelgarn's questions about Slattery's retirement, that there existed some discriminatory animus.  The record demonstrates that over the course of Slattery's eleven-year employment with RMS, Hemmelgarn made only four or five reasonable, benign (or "vague," as characterized by Slattery) inquiries into Slattery's retirement plans.  Slattery may not rely on those inquiries to establish a *prima facie* case of age discrimination.[4]  *Montgomery*, 169 F.3d at 560 ("[A]n employer may make reasonable inquiries into the retirement plans of its employees and . . . a plaintiff should not be able to rely on those inquiries to prove intentional discrimination.").

---

[4]  Slattery testified that she would often talk about retirement with other co-workers in benign, conversational settings.  (Slattery Dep. Tr. at 38:22 – 39:24, Clark Aff. Ex T, Docket No. 14.)

### b.    "Not Flexible"

Slattery next argues that RMS terminated Slattery because she was "not flexible," and that such evidence "qualifies as direct evidence of age discrimination by [RMS]." (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 23-24, Docket No. 28.)   Specifically, Slattery testified that when RMS informed her that it was terminating her position, RMS told Slattery it was because she was "not flexible in connectors."   (Slattery Dep. Tr. at 44:20 – 45:4, Clark Aff. Ex. T, Docket No. 14.)   Even the most generous interpretation of that comment, however, does not give rise to an inference of age discrimination, and Slattery may not rely on that comment to establish a *prima facie* case of age discrimination.   *See, e.g.*, *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 436 (5th Cir. 1995) ("[A] single vague statement [that] is susceptible of several interpretations, most of which are innocuous. . . . [is] insufficient to avoid summary judgment on discrimination claims.").

### c.    Hiring Mendoz and Johnson

Slattery argues that RMS' hiring of two younger employees – Mendoz and Johnson – eight months after Slattery's termination demonstrates RMS' discriminatory animus.   In a reduction-in-force case, however, the fact "[t]hat a younger employee assumed some of plaintiff's duties does not establish a prima face case because often at least one younger worker receives some of plaintiffs' duties."   *Ward*, 509 F.3d at 461. Slattery asserts that RMS hired Johnson and Mendoz on a permanent basis eight months after RMS terminated Slattery, but Slattery offers no evidence that Johnson and Mendoz

actually replaced Slattery or that they performed the same primary duties as Slattery. Instead, Slattery cites the information in the cross-training chart and attempts to show discriminatory animus by counting the number of skills that Slattery, Johnson, and Mendoz possessed at the time RMS terminated Slattery.  Slattery suggests that because she had proficiency in one more skill than Mendoz and because Johnson had proficiency in only one more skill than Slattery, the employees were relatively equal and the fact that RMS kept the younger employees while terminating Slattery is evidence giving rise to an inference of age discrimination.  (*See* Mem. in Opp'n to Mot. for Summ. J. at 12-13, 25, Docket No. 28.)  Slattery's argument, however, ignores the purpose of RMS' cross-training chart and the reasons for Slattery's termination: RMS designed the cross-training chart to ensure department-wide coverage for all skill sets and, in particular, to ensure coverage for tasks requiring critical complex skills.  In addition, the mere difference in each employee's number of skills – particularly where Slattery does not account for different proficiency levels and for whether the skill is basic or critical complex – is not probative.

Moreover, RMS terminated a thirty-four-year-old employee in the connector assembly department at the same time that it eliminated Slattery's position.  This evidence shows that RMS treated similarly situated, non-protected employees consistently with Slattery.  *Cf. Harper v. Ga.-Pac. Corp.*, 67 F. Supp. 2d 909, 914 (W.D. Tenn. 1998) (addressing pretext under the burden-shifting analysis).

Because Slattery has not set forth even circumstantial evidence of discriminatory animus, Slattery has not established a *prima facie* case of age discrimination.

## 2.     Pretext for Age Discrimination

Slattery's claims also fail because she has not shown that RMS' proffered legitimate business reason for terminating Slattery was pretext for age discrimination. RMS produced evidence that legitimate business reasons supported its decision to reduce its work force and eliminate Slattery's position.  In particular, Jacobs noted that Boeing – the Aerospace Connector Division's primary client – reduced its orders for electrical connector products, causing RMS to cut costs and reduce its workforce.  (Jacobs Aff. ¶ 6, Docket No. 15.)   Thus, the Court considers whether there is evidence that RMS' proffered legitimate business decision was pretext for age discrimination.

Showing pretext "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).   A plaintiff may establish pretext by showing that an employer's explanation is unworthy of credence because it has no basis in fact, *see Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006) (citing *Burdine*, 450 U.S. at 256), or by showing that age was a "but-for" cause of the adverse employment action, *Gross*, 129 S. Ct. at 2352; *see also Gorzinski v. Jetblue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010) ("*Gross* makes clear that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor." (some internal quotation marks omitted)).

In response to RMS' evidence relating to Boeing's reduced orders, Slattery submits an April 25, 2007, Boeing news release indicating that Boeing "was seeing a growth in airplane deliveries" from 2007 to 2009.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 17, Docket No. 28; Ex. C, Docket No. 29.)  Slattery argues that the news release shows that RMS' proffered business reason has no basis in fact because "it is illogical that [Boeing] would be reducing the amount of products that it needed to produce airplanes," while seeing a growth in airplane deliveries.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 27, Docket No. 28.)  The Court disagrees.  The Boeing press release does not conflict with Jacobs' assertion that Boeing reduced orders for electrical connectors; it merely suggests that Boeing was selling more airplanes.  Slattery seems to imply that Boeing's sales growth contradicts RMS' assertion that Boeing reduced orders for electrical connectors and that RMS had a surplus of electrical connectors, but that inference is not reasonable without additional support in the record.  Thus, Slattery's evidence does not create a fact issue as to whether RMS' proffered business reasons for Slattery's termination were pretext.

Slattery also reiterates that several months after her termination, RMS converted two younger temporary employees to full-time employment.  "Pretext may be proven by evidence showing a younger, less-qualified, weaker-performing employee replaced an older employee."  *Loeb v. Best Buy Co.*, 537 F.3d 867, 875 (8th Cir. 2008).  Here, however, Slattery has not produced **any** evidence from which a reasonable trier of fact could find that RMS hired Johnson and Mendoz to fill the same position that Slattery had held, which had a primary emphasis in packaging.  Further, Slattery has not produced

evidence demonstrating that Johnson and Mendoz were less qualified than Slattery. Rather, Slattery relies on counting the number of skills that each possessed as outlined in the cross-training chart – a method that in this Court's view is not reliable.[5]  In short, Slattery has not adduced evidence reflecting RMS' purportedly discriminatory intent. The Court therefore grants RMS' motion with respect to Slattery's ADEA and MHRA disparate-treatment claims.

### B.    Disparate-Impact Claims

In a disparate-impact claim, Slattery may challenge RMS' employment practices if they are "fair in form but discriminatory in practice."  *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 645 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074, *as recognized in Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (internal quotation marks omitted).  To establish a *prima facie* disparate-impact claim under the ADEA, Slattery must (1) identify a specific employment practice and (2) present "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *Evers v. Alliant Techsys., Inc.*, 241 F.3d 948,

---

[5]    Slattery contends that her positive performance reviews create a fact dispute about whether the legitimate business reasons for her termination were mere pretext.  In a reduction-in-force case, however, "[t]he mere termination of a competent employee when an employer is making cutbacks due to economic necessity is insufficient to establish a prima facie case of age discrimination."  *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1166 (8th Cir. 1985) (internal quotation marks omitted).

953 (8th Cir. 2001). To satisfy the second element, the "statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Watson*, 487 U.S. at 995.

Setting aside the question of whether Slattery has adduced adequate evidence of a specific RMS policy that had a disparate impact on older employees, Slattery has not pointed to any statistical evidence establishing causation. Slattery has therefore failed to produce evidence supporting a critical element of her claim. Accordingly, the Court grants RMS' motion for summary judgment on Slattery's disparate-impact claim.

## III.   FMLA CLAIMS

### A.   FMLA Interference Claim

Under the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave during any twelve-month period for any of several reasons, including for the purpose of enabling the employee "to care for [a] spouse, or a son, daughter, or parent, . . . if such spouse, son, daughter, or parent has a serious health condition" 29 U.S.C. § 2612(a)(1)(C). The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise of or attempted exercise of the right to such leave. *Id.* § 2615(a)(1). "FMLA regulations require employees to provide adequate notice to their employers of the need to take [FMLA] leave." *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997); 29 C.F.R. § 825.302.3-03.

Slattery argues that when she notified Hemmelgarn of her leave request, Hemmelgarn responded in a "tone of voice" that indicated that Slattery had to return to

work.  (Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 31, Docket No. 28.)  Slattery also argues that RMS did not inform her of her FMLA rights.  (*Id.*)  Slattery contends that, as a consequence, she "resorted to using her vacation time every time she needed to visit with her mother."  (*Id.*)

The undisputed evidence shows that RMS granted all of Slattery's requests for time off, and Slattery testified that she did not make any additional FMLA leave requests to assist her mother.  (Slattery Dep. Tr. at 20:10 – 25:16, 28:3-11, 31:22 – 33:6, Clark Aff. Ex. T, Docket No. 14.)  The record also demonstrates that RMS provided notice to all employees of their FMLA rights by posting signs in the workplace as required by federal regulations.  (Osbakken Supp. Aff. ¶ 3, Docket No. 35.)  Slattery conceded that she signed the Provider Form when she returned to work after assisting her mother, which permitted Slattery to take FMLA leave.  Slattery's assertion that she had to use vacation time to assist her mother directly contradicts Slattery's own testimony that she did not request additional time off.  Because Slattery has not adduced evidence that RMS' actions constituted an interference of or restraint on Slattery's exercise of FMLA-protected rights, the Court grants RMS' motion on the FMLA interference claim.

## B.    FMLA Retaliation Claim

The FMLA prohibits employers from retaliating against an employee for asserting rights under the FMLA.  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006).  The Court applies a variation of the *McDonnell Douglas* burden-shifting framework to FMLA retaliation claims.  *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir.

2002).  "To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002).  "[E]vidence that gives rise to an inference of retaliatory motive on the part of the employer is . . . . [necessary] to prove the required causal link." *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation marks omitted).  Here, Slattery has not produced evidence giving rise to an inference of a retaliatory motive.

Slattery offers only an allegation that she requested FMLA leave and, almost three months later, RMS terminated her employment.  "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Smith*, 302 F.3d at 832 (internal quotation marks omitted).  Slattery has not adduced any additional evidence, beyond temporal proximity of her leave request and termination, to support her retaliation claim. Moreover, the temporal proximity between her leave request and termination does not support her claim.  *See Kipp*, 280 F.3d at 897 ("[T]he interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [plaintiff's] favor on the matter of causal link."); *cf. Smith v. Ashland, Inc.*, 250 F.3d 1167, 1174 (8th Cir. 2001) (finding proximity of one month insufficient to establish a causal connection).  Slattery also testified at her deposition that no one at RMS ever

said anything to her or did anything to make her believe that her termination was motivated by retaliation for taking FMLA leave.  (Slattery Dep. Tr. at 50:17 – 51:2, Clark Aff. Ex T, Docket No. 14.)  As a result, the Court grants RMS' motion as to Slattery's FMLA retaliation claim.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant rms Corporation's Motion for Summary Judgment [Docket No. 11] is **GRANTED**.  The Court **DISMISSES WITH PREJUDICE** Slattery's Complaint [Docket No. 1].

### LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED:  September 7, 2010       _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.             JOHN R. TUNHEIM
                                  United States District Judge